UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RYAN WASHINGTON               :       CRIMINAL No. 3:01CR114(AHN)

       V.                    :       CIVIL No. 3:04CV504(AHN)

UNITED STATES OF AMERICA    :       November 7, 2005

GOVERNMENT'S RESPONSE TO WASHINGTON'S PETITION UNDER 28 USC § 2255
TO VACATE, SET ASIDE, OR CORRECT SENTENCE

The Government submits the following response to defendant-petitioner Ryan Washington's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. The petitioner was sentenced to 120 months' incarceration and 3 years' supervised release after a jury found him guilty of Count One of the Indictment, which charged him with being a previously convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The petitioner appealed his conviction, and the Second Circuit affirmed his conviction by summary order dated August 26, 2003. He now moves on collateral review to vacate his sentence. In his initial motion, filed March 24, 2004, the petitioner made six claims: (1) he was denied effective assistance of counsel because his trial counsel filed a motion to dismiss the indictment based on the Petite Policy; (2) he was denied effective assistance of counsel because his trial counsel did not move to suppress the firearm and ammunition seized from his vehicle; (3) he was denied effective assistance of counsel because his trial counsel failed adequately investigate his case; (4) his Sixth Amendment right to trial by jury was violated because the jury panel did not represent a fair cross section of his peers; (5) trial counsel's failure to discuss a potential plea agreement with him violated his right to receive a lower sentence; and (6) he was denied effective assistance of counsel because his appellate counsel did not present sufficient issues for review on appeal.

On November 12, 2004, the petitioner filed a motion to amend the sixth claim of his § 2255

motion. Specifically, he argued that his appellate counsel had been ineffective for failing to challenge specific sentencing enhancements which supposedly violated his Sixth Amendment rights, as discussed in Blakely v. Washington, 124 S. Ct. 2531 (2004). For the reasons stated below, the petitioner's motion is without merit and should be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts, which appear to be undisputed, were derived from the transcripts of the trial testimony, which were submitted as part of the parties' Joint Appendix on direct appeal, and from the record presented to the Court at sentencing. On May 2, 2000, New York Police Detectives Francis Ciccone, James Normile, Thomas Byrnes and Lieutenant John McCarthy drove to New Haven, Connecticut, to locate an individual they knew as "Ryan Washington," the petitioner in this case. Detective Ciccone worked in the 60th Precinct, which covers the Coney Island section of Brooklyn, New York. He had met the petitioner approximately four years earlier and had known him from seeing him in the neighborhood. He was familiar with the kind of car he drove, which was a green Honda with New York plate number of E343VU. It was the only car Detective Ciccone had ever seen the petitioner drive. At some point, Detective Ciccone learned that New York license plate E343VU was registered to the petitioner's mother.

New Haven police detectives had located a possible address for the petitioner at 21 Bassett Street, in New Haven. Detective Ciccone brought with him a picture of the petitioner and gave copies of it to New Haven Police Detectives Rick Pelletier, Martin Dadio and Ray Johannes, who were assisting the New York detectives. At approximately noon, the group of officers drove in three unmarked police cars to an area a few blocks away from 21 Bassett Street and developed a plan to approach the address.

Detectives Pelletier, Dadio and Johannes left the meeting area to attempt to gain access to

21 Bassett Street. When they arrived, they saw the petitioner's green Honda parked in front of the house. Detectives Dadio and Johannes walked toward the rear of the house, and Detective Pelletier knocked on the front door and claimed to be responding to a complaint of a crying baby. A woman answered the door and refused entry to the detective. The three detectives then drove back to the meeting spot, where the other two cars had been waiting. The detectives determined that they would return to 21 Bassett Street and watch from a distance to see if they could observe the petitioner entering or leaving the residence.

When the detectives arrived, they immediately noticed that the petitioner's green Honda was no longer there. All three vehicles commenced a search of the area for the petitioner's car. Detective Ciccone was driving with Lieutenant McCarthy on Shelton Street when he looked in his rear view mirror and saw the petitioner in the green Honda driving approximately one quarter block behind him. He turned his head and looked behind to confirm that it was, in fact, the petitioner. As he did this, Detectives Pelletier and Dadio drove in their car from Bassett Street toward Shelton Street and toward Detective Ciccone's location. They turned onto Shelton Street and approached from the opposite direction. Detective Ciccone angled his car inward so as to block the petitioner from driving around him, and Detective Dadio stopped his car in front of the petitioner, positioning it parallel and at a slight angle to Detective Ciccone's car.

Once his car stopped, Detective Pelletier, who had been in the front passenger seat, jumped out and walked toward the petitioner's car. He was dressed in plain clothes, but wore his badge on a lanyard around his neck. He moved quickly to the driver's side door of the green Honda and approached close enough to reach for the petitioner's door handle. He could see clearly into the car and saw that the petitioner was in the driver's seat and was alone. As Detective Pelletier reached for the door handle, the petitioner slammed on the accelerator and vaulted forward between the two

police cars. Detective Pelletier jumped backwards out of the way and just escaped being dragged between the two cars. By this time, Detective Ciccone had gotten out of the driver's side of his car and was facing and making eye contact with the petitioner. He jumped back into his car as the petitioner sped toward him and was also just able to avoid being struck. Detective Dadio had gotten out of the driver's side door of his car to approach the Honda and had to jump back into the driver's seat to miss being struck.

The petitioner rammed into both police cars as he sped away. He inflicted minor damage on the New Haven car, but almost tore the driver's side door off the New York car as Detective Ciccone attempted, with no success, to close it while diving back into his car. The petitioner then engaged the police in a high-speed chase through the residential neighborhood. At a certain point, the petitioner stopped his car and fled on foot into the back yards of several houses. Despite a foot chase and a vigorous search, he was not found in Connecticut that day.

Detective Ciccone returned to the petitioner's green Honda after being unable to apprehend the petitioner. Only minutes had passed since the petitioner had abandoned it. Detective Ciccone peered into the car and observed the handle of a gun protruding from underneath the front passenger seat. He opened the passenger side door, retrieved the gun from under the seat, and secured it by removing the magazine and the ammunition. The firearm was a Glock .45 caliber semi-automatic pistol, Model 21, with an obliterated serial number, and which had been manufactured in Austria. A second magazine loaded with .45 caliber ammunition was found in the trunk. Ballistics testing of this firearm later confirmed that it was the same firearm used in the double shooting that had occurred in Coney Island, New York on September 28, 1998 and for which the petitioner had been wanted for questioning that day.

The petitioner was eventually captured on September 28, 2000. That day, Newark police,

responding to information that the petitioner was residing at 87 Wakeman Avenue, Apartment D-5,

in Newark, went to that address and apprehended the petitioner.  In his bedroom, the police found

the following contraband: a Ruger, P-85, 9 mm handgun loaded with fifteen rounds of hollow-point

ammunition, three boxes containing approximately 250 rounds of regular and hollow-point .380, 9

mm, .357, .45 and S-223 ammunition, fifty tinfoil folds of cocaine, and thirteen nickel bags of

marijuana.

In July, 2001, the petitioner was brought to trial on charges related to the 1998 shooting in

the Supreme Court of Kings County, New York; he was acquitted of all charges.  On May 31, 2001,

a federal grand jury in New Haven, Connecticut returned a one-count indictment against the

petitioner charging him with possessing a firearm after having been convicted of a felony, in

violation of 18 U.S.C. § 922(g)(1).  Specifically, the Indictment alleged that the petitioner had

knowingly possessed the Glock .45 caliber firearm found in his vehicle in New Haven, Connecticut

on May 2, 2000.  On March 12, 2002, after a two-day trial, a jury found the petitioner guilty of Count

One of the Indictment.

The Presentence Report ("PSR") concluded that the petitioner's total offense level was 29,

which was based on the following calculations.  First, the PSR found that the base offense level was

20 under U.S.S.G. § 2K2.1(a)(4)(A) because the petitioner was previously convicted of second

degree robbery.  Second, the PSR added two levels under U.S.S.G. § 2K2.1(b)(4) because the

firearm possessed had an obliterated serial number.  Third, the PSR recommended a four level

increase under U.S.S.G. § 2k2.1(b)(5) because the petitioner possessed the firearm found in his car

in connection with another felony offense, i.e., the September 28, 1998 double shooting, or in the

alternative, because, at the time of his arrest, the petitioner possessed a loaded Ruger, P-85, 9 mm

handgun in connection with a felony offense, i.e. possession with intent to distribute marijuana and

cocaine. Finally, the PSR added three levels under the official victim enhancement, U.S.S.G. § 3A1.2(b), because the petitioner rammed his vehicle into two different police cars, almost striking the officers as they attempted to stop him. The applicable guideline range was 108-135 months of incarceration, which, given the ten-year statutory maximum sentence, yielded an effective range of 108-120 months.

At the July 31, 2002 sentencing hearing, this Court agreed with the calculations set forth in the PSR. The Government had also attempted to argue in support of an additional two-level enhancement for reckless endangerment under U.S.S.G. § 3C1.2, but the Court determined that it did not have to resolve the issue because "[e]ven without this factor of – or this enhancement factored in, he – his guideline range would exceed the 120 months . . . ." The Court sentenced the petitioner to 120 months of incarceration.

On August 1, 2002, the petitioner filed a notice of appeal. He raised two claims: first, he argued that this Court committed plain error in defining the "possession" element of the 18 U.S.C. § 922(g)(1) offense for the jury; and second, he argued that this Court improperly exercised its discretion when it applied the three-level official victim enhancement under U.S.S.G. § 3A1.2(b). On August 26, 2003, the Second Circuit rejected both claims by summary order and affirmed the petitioner's judgment of conviction.

On March 24, 2004, the petitioner filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 raising claims of ineffective assistance of trial counsel, ineffective assistance of appellate counsel and violations of his constitutional rights. On November 12, 2004, the petitioner filed a motion to amend his § 2255 motion, arguing for the first time that his appellate counsel had been ineffective for failing to challenge specific sentencing enhancements as contrary to his Sixth Amendment rights under Blakely, 124 S. Ct. 2531.

## II.   DISCUSSION

A.   Governing Legal Principles

To obtain collateral relief under 28 U.S.C. § 2255, the petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Habeas corpus relief is an extraordinary remedy and should only be granted where it is necessary to redress errors which, were they left intact, would "inherently result in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962). The strictness of this standard embodies the recognition that collateral attack upon criminal convictions is "in tension with society's strong interest in [their] finality." Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995). See also Strickland v. Washington, 466 U.S. 668, 693-94 (1983) (recognizing the "profound importance of finality in criminal proceedings."). "As a general rule, 'relief is available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" Napoli, 32 F.3d at 35 (quoting Hardy v. United States, 878 F.2d 94, 97 (2d Cir. 1989)) (internal quotations and citations omitted). Constitutional errors will not be corrected through a writ of habeas corpus unless they have had a "substantial and injurious effect," that is, unless they have resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 623, 637-38 (1993); see also Underwood v. United States, 166 F.3d 84, 87 (2d Cir. 1999) (applying Brecht to section 2255 petition).

Furthermore, a habeas petitioner must not have procedurally defaulted his claims by failing to raise them at trial and on direct appeal. For a court to review procedurally defaulted claims, the petitioner must show both "cause" for the default of each claim and "prejudice" that resulted from the alleged violation. See Ciak, 59 F.3d at 302 (quoting Wainwright v. Sykes, 433 U.S. 72, 87

(1977)).  A writ of habeas corpus will not be allowed to do service for an appeal.  See Reed v. Farley,

512 U.S. 339, 354 (1994) ("Where the petitioner–whether a state or federal prisoner–failed properly

to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for

the waiver and shows 'actual prejudice from the alleged . . . violation.'") (quoting Wainwright, 433

U.S. at 84); Douglas v. United States, 13 F.3d 43, 46 (2d Cir. 1993) (same).

The rule of procedural default can be overcome only in narrow circumstances.  One such

circumstance is where the petitioner shows that his counsel's performance was constitutionally

ineffective.  See Murray v. Carrier, 477 U.S. 478, 487-88 (1986).  A person challenging his

conviction on the basis of ineffective assistance of counsel bears a heavy burden.  "[A] court must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." Strickland, 466 U.S. at 689.  The ultimate goal of the inquiry is not to

second-guess decisions made by defense counsel; it is to ensure that the judicial proceeding is still

worthy of confidence despite any potential imperfections, as "the right to the effective assistance of

counsel is recognized not for its own sake, but because of the effect it has on the ability of the

accused to receive a fair trial." Roe v. Flores-Ortega, 528 U.S. 470, 482 (2000) (quoting United

States v. Cronic, 466 U.S. 648, 658 (1984)).

In Strickland, the Supreme Court held that a defendant must establish (1) that his counsel's

performance "fell below an objective standard of reasonableness" and (2) that counsel's

unprofessional errors actually prejudiced the defense.  Id. at 688.

> To satisfy the first, or "performance," prong, the defendant must show that counsel's
> performance was "outside the wide range of professionally competent assistance,"
> [Strickland, 466 U.S.] at 690, and to satisfy the second, or "prejudice," prong, the
> defendant must show that "there is a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been different," id. at
> 694.

Brown v. Artuz, 124 F.3d 73, 79-80 (2d Cir. 1997).  A defendant must meet both requirements of the Strickland test to demonstrate ineffective assistance of counsel.  If the defendant fails to satisfy one prong, the Court need not consider the other.  See Strickland, 466 U.S. at 697.  "The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard."  Linstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).  "The court's central concern is not with 'grad[ing[ counsel's performance,' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."  United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 696-97) (internal citations omitted).

To establish ineffective assistance of appellate counsel, a petitioner must establish the same two-part test announced in Strickland, i.e., that appellate counsel's representation was deficient and that the petitioner suffered prejudice as a result of his counsel's deficient performance.  See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citing Strickland, 466 U.S. at 687).  "In attempting to demonstrate that appellate counsel's failure to raise a . . . claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made."  Id. (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)).  "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Id.  "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' . . . and may not use hindsight to second-guess his strategy choices."  Id. (quoting Strickland, 466 U.S. at 690).  "Counsel is not

required to forecast changes in the governing law." Id.

"The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo" by an appellate court. See United States v. Hernandez, 242 F.3d 110 (2d Cir. 2001) (internal quotation marks omitted).

## B.    The Petitioner's Ineffective Assistance of Counsel Claims Have No Merit

The petitioner alleges that his trial and appellate counsel were ineffective. He claims that his trial counsel was ineffective for filing a frivolous motion to dismiss the indictment, failing to file a motion to suppress, failing to adequately investigate the case, failing to challenge the racial composition of the jury pool, and failing to discuss the terms of a plea offer prior to trial. In addition, he claims that his appellate counsel was ineffective for failing to challenge the constitutionality of his 120 month sentence. None of these claims have merit, and all can be resolved without a hearing. See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (holding that district court need not hold full testimonial hearing to resolve factual disputes underlying a habeas claim).[1]

### 1.    Trial Counsel Was Not Ineffective For Filing A Motion To Dismiss

First, the petitioner claims that his trial counsel was ineffective for filing a motion to dismiss the indictment. Specifically, trial counsel had argued that, pursuant to Petite v. United States, 361 U.S. 529 (1960), 18 U.S.C. §§ 659, 660, 1992, 2101 and 2117, 15 U.S.C. §§ 80a-36 and 1282, and

---

[1]In Chang, the Second Circuit noted, "The Supreme Court has held that, although a hearing may be warranted, that conclusion does not imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be." Id., 250 F.3d at 85 (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962). "The language of the statutes does not strip the district court of all discretion to exercise common sense." Id. "Indeed, the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal appearance of the prisoner." Id.

§ 9-2.031 of the United States Attorney's Manual, the indictment should have been dismissed because the conduct alleged therein had already formed the basis for a New York state prosecution in People v. Ryan Washington, Indictment No. 8366-00. In the New York case, the petitioner had previously been acquitted on charges involving the use and possession of the same firearm that he was charged with possessing in Connecticut on May 2, 2000. In his motion, trial counsel noted that several of the Connecticut police officers who recovered the firearm in Connecticut testified in the New York case. Trial counsel quoted the following portion of the United States Attorney's Manual:

> Although there is no general statutory bar to a federal prosecution where the defendant's conduct already has formed the basis for a state prosecution, Congress expressly has provided that, as to certain offenses, a state judgment of conviction or acquittal on the merits shall be a bar to any subsequent federal prosecution for the same act or acts.

He further argued that, even if the Government were to have sought a waiver of the Petite Policy, it would have been unsuccessful based on the facts of this case.

On March 7, 2004, after considering the petitioner's motion and the Government's response, this Court issued a written ruling denying the motion on two principal grounds. First, the Court held that the Petite Policy was "an internal policy guideline of the Department of Justice which confers no right of enforcement on a defendant." Second, the Court held that, even if the petitioner had the right to enforce the Petite Policy, enforcement would not be appropriate because the prosecution in this case was not "based on substantially the same act or transaction" as the New York case. "The only similarity between the charged offenses is that the firearm is allegedly the same."

Now, the petitioner claims that his trial counsel was constitutionally ineffective for filing the motion to dismiss. His claim has no merit. In the motion, trial counsel correctly cited and described the Petite Policy and argued that the Government should have gotten a Petite Policy waiver before prosecuting the petitioner for knowing possession of the same firearm which had been the subject

of the previous New York acquittal.  Unfortunately for the petitioner, this Court agreed with the Government's arguments and found that the policy at issue was neither enforceable, not applicable to the facts of this case.  Just because this Court ruled against the petitioner, however, does not mean that the argument itself was frivolous.  Moreover, even if the petitioner is correct that the argument was frivolous and that his trial counsel was ineffective for raising it, he cannot show prejudice.  The filing of the motion did not impair or affect any defense the petitioner had at trial.  The motion itself did not implicate any of the Government's evidence at trial, so that its resolution could not have had an effect on the petitioner's trial strategy.  In addition, the Court denied the motion prior to the start of trial, so that the petitioner had ample opportunity to change his mind about proceeding to trial based on the Court's ruling.

### 2.    Trial Counsel Was Not Ineffective For Failing To File A Motion To Suppress

Next, the petitioner argues that his trial counsel was ineffective for failing to file a motion to suppress.  Specifically, the petitioner alleges that "[t]he facts surrounding the firearm and firearm ammunition clips substantiate [that] police procedure was highly improper as well as irregular; however, counsel utterly failed to make an issue of the admissibility and/or legality of the evidence by seeking a suppression hearing on these matters."  Def.'s Mot. Vacate at 6.  He claims that "the need for a suppression hearing was substantiated by the fact [that] the 'chain of custody' over the items used in the New York State case and the present federal prosecution was never verified."  Def.'s Aff. (dated March 22, 2004) ¶ 26.

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the petitioner must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been

different absent the excludable evidence in order to demonstrate actual prejudice." Laaman v. United States, 973 F.2d 107, 113 (2d Cir. 1992) (internal quotation marks and brackets omitted) (quoting Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)); see also United States v. Williams, No. 03-1393, 112 Fed. Appx. 81, 83 (2d Cir. Sept. 10, 2004) (unpublished opinion) (rejecting ineffective assistance claim based on failure to file motion to suppress where suppression issue had no merit). "[A]lthough failure to make a suppression motion is not per se ineffective representation, . . . where trial counsel fails to make a motion to suppress because he neglected 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary,' then ineffective representation is shown." United States v. Matos, 905 F.2d 30, 33 (2d Cir. 1990). Moreover, as to effectiveness, "it is sufficient that counsel exercised 'professional discretion in deciding whether there are sufficient grounds' to file a motion." United States v. Ditommaso, 817 F.2d 201, 215 (2d Cir. 1987) (quoting LiPuma v. Comm'r, Dep't of Corrections, 560 F.2d 84, 93 (2d Cir. 1977). The Second Circuit has specifically stated, "We are understandably reluctant to require defense counsel routinely to file boilerplate motions merely to vindicate their professional competence without regard for the grounds supporting such motions." Id.; see also United States v. Boothe, 994 F.2d 63, 69 (2d Cir. 1993) (holding that trial counsel not ineffective for failing to file frivolous motions).

Here, trial counsel was not ineffective for failing to file a motion to suppress the firearm and ammunition. First, trial counsel's adept cross examination of the four police officers who testified about the handling and seizing the firearm, magazines and ammunition from the petitioner's vehicle showed that he was fully versed in the New Haven Police Department's procedure manual for the seizing and handling of evidence. Second, no additional investigation would have been necessary or appropriate to bolster any supposed grounds for suppression. Third, the very

-13-

suppression ground raised by the petitioner was appropriately raised by his trial counsel in a different form.  Specifically, based on trial counsel's perceived mishandling of the evidence at issue, he vigorously cross-examined the police officers on the issue and thereby suggested to the jury that the testimony regarding where these items were located was not credible.  In fact, trial counsel also objected to the admissibility of the magazines and ammunition located in the vehicle:

> The testimony was all over the place with regard to which magazine was in the gun, which was not, [and] where it was found.  I object to either of the magazines coming in, Your Honor, and for that matter, any of the ammunition. . . .  I don't believe it is a weight issue.  With regard to a second magazine, and we have no idea which of those is the second magazine, there's been no evidence offered as to how or who recovered that magazine and from whom.  None of the witnesses have been able to present that kind of testimony.  At this point, the only reason that this witness, I suspect, can identify it is because it's now been placed back in that original box, but there was another witness who has already testified here today who said that he wouldn't be able to identify any of them because they were just generic cartridges.

Tr. 3/11/02 at 215-16.

Even if this Court were to conclude that trial counsel was ineffective for failing to file a motion to suppress, this claim lacks merit for failure to establish prejudice.  As the Second Circuit has made clear, to prevail on an ineffective assistance of counsel claim based on a trial counsel's failure to pursue a suppression motion, the petitioner must show that the suppression motion has merit.  See, e.g., Laaman, 973 F.2d at 113.

In this case, New York Police detectives came to New Haven, Connecticut on May 2, 2000 to find the petitioner because he was a suspect in a shooting investigation in Brooklyn, New York. They knew his name, had his picture, and were familiar with his car, which was a green Honda with New York plate number of E343VU.  New Haven police detectives had located a possible address for the petitioner at 21 Bassett Street, in New Haven.  After briefing observing the petitioner's vehicle parked in front of 21 Bassett Street, two of the police officers observed the petitioner driving

the green Honda on Shelton Street. As the officers attempted to stop the petitioner, he sped away, ramming two different police vehicles and almost striking two different officers in the process. A high speed chase ensued, and after a few blocks, the petitioner stopped his car and fled on foot into the back yards of several houses. Despite a foot chase and a vigorous search, he was not found in Connecticut that day. The police secured the petitioner's vehicle only minutes after the petitioner had abandoned it. One of the detectives observed the handle of a gun protruding from underneath the front passenger seat and retrieved a loaded Glock .45 caliber semi-automatic pistol from underneath the seat. A second magazine loaded with .45 caliber ammunition was found in the trunk.

Based on these facts, which were essentially undisputed at trial, there was no viable Fourth Amendment claim to raise in a suppression motion. First, the police had reasonable suspicion to stop the petitioner based both upon their identification of him as a suspect in a pending assault investigation and his actions in nearly striking the officers with his vehicle as he sped away from the police on Shelton Street prior to being detained. Second, the firearm itself was properly seized from the vehicle as it was protruding from underneath the front passenger seat and in plain view when the detective peered into the vehicle. Third, the petitioner lacked any reasonable expectation of privacy in the vehicle and its contents because he abandoned it when he escaped from the police.

As to the petitioner's claim that trial counsel's cross examination of the officers regarding their handling of the firearm and ammunition should have supplied the basis for a suppression motion, he is incorrect. To the extent that the police mishandled any contraband seized from the vehicle, this issue was appropriately raised before the trial court and the jury. Trial counsel objected to the admissibility of the ammunition and the magazines on this ground and, through cross-examination, skillfully attacked the weight of the evidence by impugning the credibility of the officers' testimony regarding where and in what condition the firearm, ammunition and magazines

had been found within the vehicle.

**3.      Trial Counsel was not Ineffective For Failing To Adequately Investigate The Case**

In his third claim for relief, the petitioner insists that his trial counsel was ineffective for failing "to conduct any pretrial preparations." Def.'s Mot. Vacate at 7. Specifically, he claims that his trial counsel was ineffective for "failing to obtain the radio transmission transcripts to ascertain whether the time frame of the events were accurately related by the testimonies of the Officers." Def.'s Aff. (dated March 22, 2004) ¶ 27. He also claims that his trial counsel was ineffective for failing to interview Juanita Smith, the lessee of the apartment where the petitioner had been staying in New Haven, Connecticut before the police found him. See id. ¶ 28.

This claim has no merit. First, as indicated in the attached affidavit, trial counsel acknowledged that he did not obtain transcripts of the police radio transmission on May 2, 2000, but thought that such transmissions would not have been helpful to his defense. As to Ms. Smith, trial counsel indicated that he had indeed interviewed her prior to trial and determined that she would not have offered helpful testimony, and could have actually hurt the defense. Therefore, the specific claims of ineffectiveness as to trial counsel's pre-trial investigation have no merit.

Putting aside the issue of effectiveness, however, and assuming arguendo that the petitioner's factual statements regarding his counsel's performance are accurate, the petitioner cannot show prejudice. As to the radio transmission transcripts, the petitioner cannot establish whether such transcripts existed at the time of his May 31, 2001 indictment, which was returned over one year after the seizure of the firearm in New Haven on May 2, 2000. Moreover, beyond claiming that the transcripts could have been used to cross examine the officers regarding the timing of the events on the day at issue, the petitioner has failed to articulate how they could have benefitted him at trial.

-16-

In the end, the petitioner was charged and convicted of knowing possession of a firearm by a convicted felon based on his abandonment of a vehicle concealing a firearm under the front passenger seat. The same is true with respect to any potential interview of Juanita Smith. Ms. Smith was the lessee of the apartment at 21 Bassett Street where the petitioner had supposedly been staying, but her testimony hardly would have been relevant regarding the firearm recovered from the petitioner's vehicle after the high speed chase. See Ocampo v. United States, No. 99-CV-6727(JG), 2004 WL 61195932, at *6 (E.D.N.Y. March 22, 2004) (unpublished decision) (upholding trial counsel's decision not to attempt to interview specific witnesses pre-trial and pointing out that petitioner had failed to articulate what impeaching evidence might have been revealed during such interviews); see also Wiggins v. Smith, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

### 4.    Trial Counsel was not Ineffective for Failing to Challenge the Racial Composition of the Jury Pool

The petitioner also claims that his Sixth Amendment right to a trial by jury was violated due to the racial composition of the venire panel and that his trial counsel was ineffective for failing to raise such a challenge. He claimed that the jury was chosen in a "geographic locations where people of color constitute more than the percentage reflected by the three people of color in the original jury." Def.'s Mot. Vacate at 7a.

To show an equal protection violation in the context of grand jury or petit jury selection, a defendant must "show that the procedure employed resulted in substantial underrepresentation of the members of a race or another identifiable group." Sosa v. Dretke, 133 Fed. Appx. 114, 126 (5th

Cir. May 31, 2005) (unpublished decision) (relying on <u>Rose v. Mitchell</u>, 443 U.S. 545, 565 (1979)). "The test for determining whether this standard has been satisfied has four components: (1) the petitioner must establish the excluded group is a recognizable, distinct class, singled out for different treatment under state law, as written or as applied; (2) the degree of underrepresentation must be proved by comparing the population of the group in the total population to the proportion called to serve as . . . jurors, over a significant period of time; (3) there must be a selection procedure that is susceptible of abuse or is not racially neutral to support the presumption of discrimination raised by the statistical showing; and (4) once the petitioner establishes the foregoing prima facie case, the burden shifts to the [Government] to rebut the prima facie case." <u>Id.</u> (relying upon <u>Mitchell</u>).

In addition, "the Sixth Amendment guarantees a criminal defendant the right to have his or her jury chosen from a venire or panel representing a fair cross section of the community." <u>Sosa</u>, 133 Fed. Appx. at 127 (relying upon <u>Taylor v. Louisiana</u>, 419 U.S. 522, 527-30 (1975). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresenation is due to systematic exclusion of the group in the jury selection process." <u>Id.</u> (relying upon <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979)).

Fed. R. Crim. P. 12(b)(2) "provides that certain defenses and objections are waived unless raised before trial[.]" <u>United States v. Peck</u>, 829 F. Supp. 555, 557 (D. Conn. 1992). The rule expressly applies to challenges to an indictment based on alleged defects in the grand jury pool's composition. <u>See id.</u>; Fed. R. Crim. P. 12(b)(2) (providing that objections based on defects in the indictment must be raised prior to trial). Rule 12(b)(2)'s waiver provision applies to challenges to

the petit jury array as well.  See Shotwell Manuf. v. United States, 371 U.S. 341, 362 (1963).  For

this reason, collateral attacks based on alleged defects in the composition of the petit jury are barred.

See id.; United States v. Vecchiarello, 536 F.2d 420, 423 (D.C. Cir. 1976); Paige v. United States,

493 F.2d 22 (2d Cir. 1974).  "To be relieved from a waiver, a defendant raising such a challenge for

the first time on a section 2255 motion must show cause for failing to raise the challenge prior to trial

and actual prejudice resulting from the alleged violation."  United States v. Tarascio, 15 F.3d 224,

225 (2d Cir. 1993); see also Davis v. United States, 411 U.S. 233, 242 (1973) (holding that Rule

12(b)(2)'s requirement that defendant show cause for failing to raise jury challenge prior to trial also

applies to habeas petitioners raising the claim for the first time).

In his § 2255 motion, the petitioner asserts that his Sixth Amendment right "to a trial by peers

was violated by an obvious unconstitutional manipulation of the jury wheel to exclude 'people of

color,' in a geographical location where people of color constitute more than the percentage reflected

by the three people of color in the original jury."  Def.'s Mot. Vacate at 7a.  He further claims that

"trial counsel was ineffective when he failed to contest the composition of the jury pool and,

thereafter, purposely misadvised petitioner that he could not contest the jury venire."  Id.  In his

supplemental affidavit, the petitioner claims that, of a pool of approximately 100 individuals, only

one was "African-American," and that, when he raised the issue with his attorney, his attorney stated

that he could do nothing about it.  See Def.'s Aff. (dated March 22, 2004) ¶¶ 29-30.  He states that

"the jury pool in my case . . . completely underrepresented me as an African American [and] caused

me prejudice."  Id. ¶ 32.

It is not disputed that, at the time of jury selection, the petitioner failed to raise any challenge

as to the composition of the petit jury pool or the petit jury itself.  A review of the transcript of jury

selection reveals only one reference to the race of any particular venire person.  That reference

occurred when the Court noted, near the end of jury selection, that it would not dismiss Juror

Number 102 because, although he was a self-employed cab driver, he was the only African-

American left in the original pool of approximately 64 individuals who had been questioned.  The

jury selection transcript does indicate whether Juror Number 102 was the subject of a peremptory

strike.  In addition, the transcript does not indicate whether additional African-Americans were

members of the original venire panel.  At no time, however, did the petitioner indicate an objection

to the racial composition of the jury pool or the petit jury.  As a result, the petitioner has waived any

such challenge under Rule 12(b)(2) and the Supreme Court's decisions in <u>Shotwell</u> and <u>Davis</u>.[2]

        Presumably, the petitioner attempts to show "cause" for his waiver by arguing that he had

instructed his attorney to raise such a challenge, but his attorney had refused to do so.  The affidavit

submitted by trial counsel, however, contradicts the petitioner's claim and shows that, in fact, the

petitioner did not request that his attorney challenge the racial composition of the jury pool or the

petit jury at the time of jury selection.  Moreover, the affidavit indicates that trial counsel did not

think a motion challenging the racial composition of the venire panel would have been successful.

<u>See</u> <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989); <u>see also</u> <u>Ladd v. Jones</u>, 864 F.2d 108,

109 (1989) (rejecting petitioner's claim his lawyer's ineffective assistance caused him not to

challenge the jury panel based on fact that claim itself was meritless).  Here, just as in <u>Lancaster</u>, the

petitioner has not produced any evidence to show that his trial counsel "was unreasonable in

deciding not to file what he believed to be a meritless motion."  <u>Lancaster</u>, 880 F.2d at 375.  "It is

all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse

---

        [2]It appears that the first time the petitioner raised a challenge to the jury array was during
his July 31, 2002 sentencing hearing.  At that time, the petitioner recognized that he had waived
his right to make the challenge by not objecting at jury selection, but claimed, as he does here,
that he had directed his trial counsel to make an objection, and his trial counsel had refused to do
so.  <u>See</u> Tr. 7/31/02 at 82.

-20-

sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689; see also Gates v. Zant, 863 F.2d 1492, 1499 (11th Cir. 1989) (upholding trial counsel's decision "not to raise a jury list challenge, even if made without substantial investigation"). It is a matter of trial strategy for a defense attorney to decide, based on his opinion of the likelihood of success, not to pursue a challenge to the racial composition of the jury pool. See Baldwin v. Johnson, 152 F.3d 1304, 1313 (11th Cir. 1998).

In addition, the petitioner has failed to show prejudice as a result of his attorney's failure to challenge the racial composition of the venire panel. The petitioner relies on the alleged racial composition of the venire panel, but does not allege "specific facts to show that blacks were systematically excluded" from the panel. See Oliver v. Wainwright, 795 F.2d 1524, 1531 (11th Cir. 1986); United States v. Ward, 610 F.2d 294, 295 (5th Cir. 1980) (denying habeas relief where petitioner did not make specific allegations regarding jury selection process, but merely contended "that he was tried by an all-white jury, that 50 percent of the community from which the jury was selected was white, and that only two black persons were among the veniremen"). In reaching his conclusion at this juncture that the venire panel was not comprised of a fair cross section of the community, the petitioner most certainly does not take into account the racial composition of all of the various towns and counties across Connecticut that form the population from which a Bridgeport federal venire panel is selected. Moreover, in making this argument, the petitioner fails to account for the strength of the evidence against him. As the Court is aware, the evidence against the petitioner, which was presented almost entirely through the testimony of four police officers, was simply that, on May 2, 2000, he engaged the police in a high speed chase through a residential neighborhood in New Haven, and, in the process, abandoned his car, leaving behind a loaded, semi-

automatic firearm under the front passenger seat.  See Davis, 411 U.S. at 243-44 (citing district

court's ruling that, among other things, prejudice was not shown based on the strength of the

Government's case); Peck, 829 F. Supp. at 559 (finding lack of prejudice based on strength of

Government's case).

### 5.    Trial Counsel Did Discuss Potential Plea Agreement With Petitioner

The petitioner's final ineffective assistance claim as to his trial counsel is that trial counsel

allegedly failed to "advise petitioner of the plea offer presented to him by the Assistant U.S. Attorney

and the possibility of a plea of guilty."  Def.'s Mot. Vacate at 7a.  He claims that his counsel's

alleged failure to discuss the plea agreement with him deprived him of the chance to receive a lesser

sentence.  See id.

The petitioner's factual allegations related to this claim are rebutted both by the

representation's in trial counsel's attached affidavit, and the March 7, 2002 jury selection transcript.

In the affidavit, trial counsel specifically states that he did indeed discuss a potential guilty plea with

the petitioner and the potential guideline range that could result if the petitioner pleaded guilty.

Moreover, at the start of jury selection, the following colloquy occurred:

Mr. Kurimai:    Yesterday, Your Honor, Mr. Walkley brought to the Court's attention that he had not
discussed with his client the potential guideline calculations and matters of the
difference between a conviction following trial and a plea and things of that nature.
It's my recollection, although I don't know the case off the top of my head, that
failure to discuss that could be grounds for a 2255 motion on down the road, and I
would not like to see us in that position.  So if the Court would care to inquire of Mr.
Walkley and/or his client to the extent that the Court things it appropriate as to
whether such discussions were held and the client is really knowledgeable about the
respective guideline disparities, I think it might be in order.

The Court:    Mr. Walkley.

Mr. Walkley:  Thank you.  Your Honor, Mr. Washington and I have talked about a plea.  We have
talked about it in general terms, but we've talked about it from a sentencing
guidelines point of view as well.  The kind of calculations that we have, Mr.

> Washington and I have talked about are similar to the kinds of numbers and
> calculations that the United States attorney was mentioning to me yesterday, and even
> after the discussions that Mr. Washington and I have had, it is not in his interest to
> enter a plea at this time, Your Honor, and I believe that --

T.3/7/02 at 2-3.  As the transcript demonstrates, at the time of trial, the petitioner had ample

opportunity to raise before this Court the very issue he raises now.  The Government specifically

asked the Court to inquire whether the petitioner understood the guideline disparities if he was

convicted after a guilty plea as compared to being convicted after a trial.  In response, trial counsel

specifically confirmed that the petitioner understood the disparity and was prepared to go to trial.

### 6.    Appellate Counsel Was Not Ineffective For Failing To A Raise Sixth Amendment Challenges To Various Sentencing Enhancements

In his original petition, the petitioner argued  that his appellate counsel was ineffective

because of the issues he chose to raise on direct appeal.  He did not specify, however, which issues

should have been raised.  On November 8, 2004, the petitioner filed a motion to amend the sixth

claim of his habeas petition to incorporate the argument that his appellate counsel should have raised

a Sixth Amendment challenge to the various sentencing enhancements that the Court applied at

sentencing.  In particular, the petitioner alleged that these enhancements violated the principles set

forth in Blakely, 124 S. Ct. 2531, because they were based on factual findings not proven to a jury

beyond a reasonable doubt.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the

Sentencing Guidelines violated the Sixth Amendment to the Constitution because such guidelines

allowed a maximum sentence authorized by a guilty plea or verdict to increase based on factual

findings (other than the proof of a prior conviction) made by a court under the preponderance of the

evidence standard.  See id. at 755-56.  To remedy this constitutional violation, the Court held that

the Sentencing Guidelines would no longer be mandatory, binding rules for the trial court, but would

be advisory, to be considered as part of a whole host of sentencing factors. See id. at 756-57. The Court expressly held that its decision applied to all cases pending on direct review. See id. The Court did not address whether its holding applied retroactively to cases on collateral review. See id.

The Second Circuit recently joined several other courts in holding that Booker does not apply to cases on collateral review. See Guzman v. United States, 404 F.3d 139, 141 (2d Cir. 2005); see also Humphress v. United States, 398 F.3d 855, 860 (6th Cir. 2005); McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005); United States v. Price, 400 F.3d 844, 845 (10th Cir. 2005); Varela v. United States, 400 F.3d 864, 868 (11th Cir. 2005). In Guzman, the Court reasoned that, under the analysis set forth in Teague v. Lane, 489 U.S. 288 (1989) (plurality opinion), the decision in Booker did not establish a substantive rule or a watershed rule of procedure. See Guzman, 404 F.3d at 143 (holding that Booker did not establish a watershed rule because "the only change is the degree of flexibility judges enjoy in applying the guideline system.") (internal ellipses and brackets omitted). Relying on the Supreme Court's statement in Schriro v. Summerlin, 124 S. Ct. 2519, 2525 (2004) (holding that Ring did not apply to cases on collateral review) that "we cannot confidently say that judicial factfinding seriously diminishes accuracy," the Second Circuit explained:

> The procedural defect identified in Booker is that sentence-enhancing factors were found by judges rather than by juries, and by a preponderance rather than beyond a reasonable doubt; but the remedy--to render the Guidelines advisory--vested greater discretion in judges, not less. . . . [T]he chief goal of the mandatory Guidelines project was to reduce the 'disparity and inherent unfairness' caused by discretionary sentencing. . . . We cannot say that the Guidelines actually advanced that goal, and mitigated unwarranted disparity and unfairness. By the same token, we cannot assume that the mandatory Guidelines system under which Guzman was sentenced seriously diminished the accuracy or fundamental fairness of the sentencing process. In sum, the rule established by Booker 'has none of the primacy and centrality of the rule adopted in Gideon or other rules which may be thought to be within the exception.'

Guzman, 404 F.3d at 143-44. The Second Circuit's holding in Guzman appears to undermine the petitioner's claim in his § 2255 petition, in that it establishes that the principles set forth in Booker

and its progeny do not apply retroactively to cases on collateral review.

To the extent that the petitioner is not asserting a claim directly under Blakely and Booker, but instead is arguing that his appellate counsel was ineffective for failing to raise the constitutional argument he now raises on collateral review, his claim likewise fails. First, at the time of the petitioner's sentencing, the constitutionality of the Sentencing Guidelines had not been challenged under the Sixth Amendment grounds set forth in Blakely. Indeed, despite the Supreme Court's prior holding in Apprendi v. New Jersey, 530 U.S. 466 (2000), the Sentencing Guidelines had not been scrutinized under the Sixth Amendment framework later adopted in Booker. The Second Circuit specifically noted this fact in Guzman: "It cannot be said that the result in Booker was apparent to 'all reasonable jurists'; in Booker itself, dissenters undertook to explain why the holding in Booker was not compelled by Apprendi or Blakely." Guzman, 404 F.3d at 142; see also United States v. Burgess, 142 Fed. Appx. 232, 240 (6th Cir. June 22, 2005) (unpublished decision) (holding that "trial counsel cannot be deemed ineffective for failing to anticipate" decisions in Blakely and Booker). "Counsel is not required to forecast changes in the governing law." Mayo, 13 F.3d at 533.

Second, even had appellate counsel raised the issues suggested by the petitioner, they would have been rejected because Blakely and Booker had not yet been decided, and the Supreme Court had upheld the constitutionality of the Sentencing Guidelines. It also bears note that the post-Booker framework would not have benefitted this petitioner because the Court imposed the maximum 120 month statutory sentence in this case unencumbered by the mandatory guideline system. Indeed, at sentencing, it was not necessary for the Court to reach a decision as to all of the proposed enhancements sought by the Government because it had concluded that the appropriate sentence in the case was 120 months' incarceration, which was a sentence within the range calculated without all of the enhancements.

III.   **CONCLUSION**

For the foregoing reasons, the Court should dismiss the petitioner's habeas petition in its

entirety.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

By:   _____
          JAMES K. FILAN, JR.
          ASSISTANT U.S. ATTORNEY

For:   ROBERT M. SPECTOR
          ASSISTANT U.S. ATTORNEY
          Federal Bar No. CT18082
          450 Main Street
          Hartford, CT  06103
          Tel.: (860) 947-1101, ext. 20

_____   CERTIFICATE OF SERVICE

This is to certify that on November 7, 2005, a copy of the foregoing was mailed, postage

prepaid, to:

Mr. Ryan Washington
Inmate Number 67016-053
USP ALLENWOOD
U.S. PENITENTIARY
P.O. BOX 3000
WHITE DEER, PA 17887

By:   _____
          JAMES K. FILAN, JR.
          Assistant United States Attorney

For:   ROBERT M. SPECTOR
          Assistant United States Attorney